IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| VERNON GASKIN | : | No. 15-352 |

## MEMORANDUM

PRATTER, J.                                                                                        DECEMBER 9, 2020

Defendant Vernon Gaskin seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Gaskin offers two bases for his motion: (1) the COVID-19 pandemic and Mr. Gaskin's health conditions, and (2) his desire to assist the mother of his child with childcare for their daughter, and for Mr. Gaskin to take care of his elderly parent. The Government opposes Mr. Gaskin's Motion. For the following reasons, the Court denies the Motion.

### BACKGROUND

### I. Mr. Gaskin's Criminal Conduct

On October 6, 2015, Mr. Gaskin pled guilty to three counts: armed bank robbery in violation of 18 U.S.C. § 2113(d) (Count One), using, carrying, and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count Two), and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Three). (Doc. No. 35 at 1-2.) All three counts related to Mr. Gaskin's actions on July 1, 2015. On that date, Mr. Gaskin entered a Wells Fargo bank branch with a firearm. Mr. Gaskin first sought to engender sympathy by lying that his girlfriend and child had been kidnapped and he needed money. (Doc. No. 35 at 17.) When this did not work, he demanded $10,000 and threatened to shoot if anyone sounded an alarm. (Doc. No. 35 at 17.) Mr. Gaskin then took money from three bank drawers and fled. (Doc. No. 17.)

This was Mr. Gaskin's second armed robbery. In 2006, Mr. Gaskin and an accomplice had robbed a 7-Eleven convenience store. (Doc. No. 35 at 2.) Mr. Gaskin pointed his firearm at the victim, ordered him to open the register and get on his knees, and stole $500. (Doc. No. 35 at 2.) After pleading guilty, Mr. Gaskin was sentenced to three to six years and was paroled after serving four years. (Doc. No. 35. at 2.) Two years later, Mr. Gaskin was arrested for driving a stolen car. (Doc. No. 35 at 2.) While on bail for that offense, Mr. Gaskin committed the armed robbery for which he is presently serving a sentence of 121 months. (Doc. No. 35 at 2.)

Mr. Gaskin has served approximately 64 months of this sentence and has received credit for 6 months of good conduct time. (Doc. No. 35 at 2.) Thus, he is at roughly the halfway point in his sentence. He is serving his sentence at the Federal Correctional Institution (FCI) Schuylkill, in Minersville, Pennsylvania. (Doc. No. 35 at 2.)

## II.     Mr. Gaskin's Request for Compassionate Release

In July 2020, Mr. Gaskin emailed the warden requesting compassionate release due to his pre-diabetes, asthma, and need to care for his family members. (Doc. No. 33 at 5.) His request was denied. (Doc. No. 33 at 6.) Mr. Gaskin now seeks relief from this Court on the same grounds.

According to BOP medical records, Mr. Gaskin was diagnosed with asthma. But he has never sought or received any treatment for an acute asthmatic episode while incarcerated, and receives no prescription drugs to manage his asthma. (Doc. No. 35 at 14.) Therefore, the government argues that his asthma has resolved and is in remission. (Doc. No. 35 at 14.) Mr. Gaskin also argues that he suffers from diabetes. (Doc. No. 33 at 2.) But Mr. Gaskin's test results show that he suffers from prediabetes, not type 2 diabetes. (Doc. No. 35 at 15-16.)

Mr. Gaskin seeks compassionate release due to the higher risk of severe illness or death these conditions represent should he contract COVID-19. (Doc. No. 33 at 1-2.)

2

### III. BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk

---

[1] BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Dec. 9, 2020).

[2] BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Dec. 9, 2020).

factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Thus far, BOP's efforts at FCI Schuylkill have been among the most positive in the BOP system. There are currently four COVID-positive inmates and four COVID-positive staff

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

4

members; one inmate and five staff members have recovered, and no inmates or staff members have died from the disease.[4]

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons

---

[4] The data is current as of December 9, 2020, according to the BOP website, available at htttps://www.bop.gov/coronavirus.

[5] "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

[6] The Government appears to concede that Mr. Gaskin met the exhaustion requirement and it does not address the issue in its brief. In any event, the Court agrees that Mr. Gaskin has met the exhaustion requirement because he emailed his warden requesting compassionate release and his request was rejected. (Doc. No. 33 at 5-6.)

However, Mr. Gaskin also mentions "High Blood Pressure" in his motion. (Doc. No. 33 at 2.) But Mr. Gaskin failed to list that condition in his email to the warden, (Doc. No. 33 at 5), and has therefore not met the exhaustion requirement for that condition. *See United States v. McNair*, No. CR 04-267 (FLW), 2020 WL 5036201, at *4 (D.N.J. Aug. 26, 2020) (refusing to consider basis for compassionate release that was not presented to the BOP). And even if this Court considered "High Blood Pressure," Mr. Gaskin offers no evidence showing the existence or severity of this condition, or why it justifies compassionate release. Therefore, the remainder of this opinion considers only the bases Mr. Gaskin included in his request to the Warden.

warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person, or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant

---

[7] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Mr. Gaskin is not eligible for compassionate release because he does not present an "extraordinary and compelling reason." While Mr. Gaskin cites health and family reasons, neither of these meets the requirements for compassionate release.

First, Mr. Gaskin's health conditions do not justify early release. While type 2 diabetes is on the CDC's list of risk factors,[8] prediabetes is not. *See United States v. Rae*, No. 15-cr-432, 2020 WL 4544387, at *4 (E.D. Pa. Aug. 6, 2020) ("Pre-diabetes, however, is not listed by the CDC as a condition that increases the risk of COVID-19 complications."). Neither does Mr. Gaskin's asthma justify early release. Mr. Gaskin does not have daily symptoms, does not use his inhaler daily, has not sought treatment for an acute asthmatic episode while incarcerated, and has no need for prescription drugs to manage his asthma. (Doc. No. 35 at 14.) Courts regularly deny release for mild asthma with similar symptoms. *See, e.g.*, *United States v. Slone*, No. CR 16-400, 2020 WL 3542196, at *6 (E.D. Pa. June 30, 2020); *United States v. Daniels*, No. CR 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020).

Second, Mr. Gaskin's family reasons do not justify early release. The Sentencing Commission's policy note states defines an "extraordinary and compelling reason" for family circumstances as either "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" or "[t]he incapacitation of the defendant's spouse or registered partner

---

[8] Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (last updated Dec. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 7, 2020).

when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 (Application Note 1.(C)(i)-(ii)). Mr. Gaskin does not allege that he is the only available caregiver for his child. Neither does the desire to care for elderly parents qualify as extraordinary. "Many, if not all inmates, have aging and sick parents. Such circumstance is not extraordinary." *United States v. Ingram*, No. 2:14-CR-40, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019).

And even if Mr. Gaskin presented an extraordinary and compelling reason that warranted compassionate release, consideration of the § 3553(a) factors necessitates a denial of Mr. Gaskin's motion. Mr. Gaskin has failed to show how releasing him before he serves the full term of his sentence would align with the statutory sentencing factors, notably the seriousness of his offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to deter others from similar criminality. *See* 18 U.S.C. § 3553(a). Mr. Gaskin's criminal conduct, which occurred only five years ago, demonstrates that he is a danger to the community. Robbing a bank, he drew his weapon and declared that he would shoot if anyone sounded the alarm. Mr. Gaskin did all of this while on bail. Nor was this Mr. Gaskin's first violent offense. Mr. Gaskin also robbed a 7-Eleven convenience store, during which he pointed a firearm at his victim.

Mr. Gaskin has also not served the bulk of his sentence. Accounting for good conduct, Mr. Gaskin has served approximately 70 months, or about 58%, of his 121-month sentence for a crime of violence.[9] As a result, release would not reflect the seriousness of the crime, promote respect for the law, or provide just punishment for the offense. *See* 18 U.S.C. § 3553. *See also United States v. Spivey*, No. CR 10-00059-01, 2020 WL 3828600, at *1-3 (E.D. Pa. July 8, 2020)

---

[9]  Mr. Gaskin asserts that he "has served 75% of his time," but does not offer any argument to the contrary of the government's calculation.

8

(compassionate release denied where defendant committed "serious and violent criminal acts," even though defendant had served 75% of his sentence).

## Conclusion

For the foregoing reasons, the Court denies Mr. Gaskin's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

*/s/ Gene E.K. Pratter*

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**